UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

JEREMY SKEHAN,

        Plaintiff,

      - against -

REAGAN KELLY, individually, JAMES GAFFNEY,
individually, ROBERT HOLLAND, individually,
ALEXANDER RICOZZI, individually, MARY MATERO,
individually, PETER J. PRIMROSE, individually,
EDWARD FLYNN, individually, PHILIP TRIFILETTI,
individually, WILLIAM J. PAONESSA, individually,
TONY VOZZA, individually, CHRISTIE DERRICO,
individually, JOHN ANGILETTA, individually, and THE
VILLAGE OF MAMARONECK, NEW YORK

        Defendants.
-------------------------------------------------------------x

JOHN DICIOCCIO and PETER MONACHELLI,

        Plaintiffs,

      - against -

EDWARD E. FLYNN, individually, MARY MATERO,
individually, ALEXANDER RICOZZI, individually,
HANK PAUL, individually, ROBERT CARDILLO,
individually, JAMES GAFFNEY, individually, ROBERT
HOLLAND, individually, and THE VILLAGE OF
MAMARONECK, NEW YORK

        Defendants.
-------------------------------------------------------------x

PAUL MICALLIZI,

        Plaintiff,

      - against -

EDWARD FLYNN, individually, PHILIP TRIFILETTI,
individually, WILLIAM J. PAONESSA, individually,

03 Civ. 5977 (CLB)

*Memorandum & Order*

03 Civ. 6824 (CLB)

04 Civ. 2968 (CLB)



-1-



Copies mailed / handed / faxed to counsel 04/15/05

TONY VOZZA, individually, CHRISTIE DERRICO,
individually, JOSEPH ANGILETTA, individually, and
THE VILLAGE OF MAMARONECK, NEW YORK.

                    Defendants.
--------------------------------------------------------------------x
Brieant, J.

Before the Court are two motions for summary judgment under Fed. R. Civ. P. 56,

brought by the Defendants in these federal question cases under the First and Fourteenth

Amendments to the United States Constitution. The first motion was filed by Mr. Edward Flynn

on December 20, 2004 (Doc. #85). The second motion was filed by the Village of Mamaroneck

and its Village Trustees, also on December 20, 2004 (Doc. #84). Opposition papers to both

motions were filed on January 18, 2005, and these motions were heard on February 15, 2005 and

fully submitted on March 2, 2005.


The following facts are assumed as true for purposes of these motions only. Plaintiffs

Jeremy Skehan, John DiCiccio, Peter Monachelli and Paul Micalizzi are former employees of the

Mamaroneck Police Department. Defendant Edward Flynn is the Mamaroneck Police Chief.

Defendants Philip Trifiletti, William Paonessa, Tony Vozza, Christie Derrico and Joseph

Angiletta, each sued individually in this case, comprise the Mamaroneck Village Board. On

March 7, 2005, Defendants Hank Paul, Regan Kelly, Robert Cardillo, Mary Matero and

Alexander Ricozzi were terminated by Offers of Judgment under Fed. R. Civ. P. 68.


On May 3, 2003, a two car automobile collision occurred within the Village. One car,

driven by a female minor ("G.A."), overturned. Officers Kelly, Primrose and Gaffney responded

to this accident. Officer Gaffney reported finding an unsealed bottle of beer in the overturned automobile. He ordered Officer Kelly to arrest G.A. She was issued a Desk Appearance Ticket for DWI, but was not taken into custody. Mr. Skehan was performing administrative duties at police headquarters and was not an eyewitness to these events.

As required by police procedure, Officer Kelly completed a DWI Supporting Deposition and Bill of Particulars, and was assisted by Mr. Skehan in doing so. These pre-printed form documents state that probable cause to arrest G.A. was based upon an "open container of an Alcoholic Beverage in or near vehicle." Other facts set forth on the printed form such as "Odor of Alcoholic Beverage," "Swaying," "Glassy Eyes," "Impaired Speech," or "Blood Shot Eyes," were not checked. Based upon these documents, as well as further conversations with Officer Kelly[1], Mr. Skehan believed that probable cause to arrest G.A. had not in fact existed and that Officer Gaffney's order to arrest G.A. had been unlawful.

On May 13, 2003, Mr. Skehan reported this belief to Assistant District Attorney Jeffrey Chartier of the Westchester County District Attorney's Office, and notified his chain of command of this fact the following day.[2] While speaking with the ADA, Mr. Skehan expressed

---

[1]Mr. Skehan alleges that Officer Kelly told him that he had been ordered to arrest G.A., that if he had gone to a hearing, he would have told the judge that he saw no signs of intoxication, never smelled alcohol, and that the case should be dismissed.

[2]Mr. Skehan also alleged that the Police Department had ordered him not to pursue the investigation of an individual named Ronald Greenland. Mr. Skehan claimed that this order was because of Mr. Greenland's race. Defendants deny this accusation and assert that the order was intended to protect Mr. Skehan from a possible lawsuit.

that his concerns would have been covered up had he gone through the chain of command. The District Attorney's Office referred Mr. Skehan's concerns to Chief Flynn. On May 30, 2003, Mr. Skehan was suspended by Lieutenant A.J. Ricozzi, the Acting Chief of Police, *see Pl's. Ex. 28,* for reporting "false and/or misleading information to the District Attorney's Office and to the Police Department" which was "deliberate and motivated by the fact that two weeks before you made the accusations, you were informed that the Superior Officer you accused will be a witness for the Police Department in a pending disciplinary matter concerning you." *See id.*[3]

On this same day, Plaintiffs John DiCiccio and Peter Monachelli posted a memorandum on the station house's non-public PBA bulletin board stating that Mr. Skehan was being treated unfairly, that his First Amendment rights were being violated and that the Village was ignoring allegations of racially-motivated decision making by its Police Department and was covering up G.A.'s improper arrest. *See Pl.'s Ex. 33.* On June 4, 2003, Mr. Flynn wrote a memorandum to all members of the Department, and stated in this memorandum that this posting was a "significant violation of Department Rules," and displayed "contempt for the superior officer's legal and privacy rights." *See Pl.'s Ex. 38.* He stated further that the manner in which this information had been publicized raised "complicated legal issues" and that "appropriate action" would be taken in response "to address this calumny."

---

[3]This "pending disciplinary matter" concerns allegations that Mr. Skehan failed to provide the name of his physician when such information was requested by his superiors, and that Mr. Skehan had otherwise failed to obey direct orders. These prior disciplinary charges do not form the basis for this lawsuit.

On June 9, Mr. Skehan was served with a list of forty-seven specifications describing his alleged violation of fourteen sections of the Mamaroneck Police Department's Rules and Regulations. Mr. Skehan failed allegedly to follow proper Police Department protocol in meeting with the District Attorney's Office prior to reporting within his chain of command, reporting false and/or misleading information to the District Attorney and other police officers and in the process accused superior officers of serious misconduct. *See Pl.'s Ex. 40.* Under N.Y. Consolidated Laws § 5711-q, he was suspended without pay pending a disciplinary hearing. On June 10, the Board voted to continue Mr. Skehan's suspension.

On July 2, Mr. DiCiccio was ordered to appear for an interview, scheduled for the following day, as part of an investigation "into the posting of two documents in the Department facilities on May 30, 2003 and of matters relating to the posting."[4] Both Mr. DiCiccio's PBA and private counsel requested an adjournment, *see Pls.'s Ex. 43 & 44*, which was denied. *See Pls.' Ex. 45.* Mr. DiCiccio attended this interview, but on the advice of counsel refused to answer questions or provide documents relating to these memoranda. He was suspended without pay on July 4, 2003 and charged with nine specifications on July 8 for failing to provide documents or answer questions posed at his interview relating to the memoranda, as well as for throwing his Department-issued firearm and other Departmental equipment to the floor in the presence of a superior officer. On July 18, 2003, the Board voted to continue his suspension pending his disciplinary hearing. On December 26, 2003, he was charged with additional

---

[4]Mr. Skehan had sent a memorandum to Mr. Monachelli on May 23, 2003, and this investigation concerned that memorandum as well.

violations for allegedly (1) using PBA funds to purchase Internet pornography; (2) tape recording secretly a department disciplinary hearing; and (3) playing this recording for Mr. Skehan.

On July 8, 2003, Mr. Monachelli was informed that he was being investigated for the same memoranda as Mr. DiCiccio and was ordered to attend an interview, at which he also refused to answer certain questions and provide documents. On September 12, 2003, he was charged with six specifications for failing to answer questions posed by Mr. Flynn and because his memoranda violated Department rules. He was assigned to desk duty.

Mr. Skehan's hearing began on July 17, 2003, recommenced on July 28 and October 21, 2003. On August 11, 2003, Mr. Skehan filed his Complaint in this Court, alleging one claim of First Amendment retaliation and three claims of Equal Protection violations for selective prosecution and disparate treatment. An Amended Complaint was filed on October 7, 2003, adding two claims that N.Y. Unconsolidated Laws § 5711-q is unconstitutional both facially and as applied to Mr. Skehan. Mr. DiCiccio and Mr. Monachelli filed a joint Complaint on September 8, 2003. An Amended Complaint was filed on September 15, 2003 and a Second Amended Complaint was filed on March 2, 2004. These Plaintiffs allege two claims of First Amendment retaliation.

On November 10, 2003, the Board voted to return Mr. Skehan to the Village payroll pending the outcome of his hearing. Mr. Skehan's hearing resumed on November 26, 2003, with former New York State Supreme Court Justice James Cowhey sitting as hearing officer. On

February 14, 2004, Mr. Micalizzi wrote a letter to the Village Board, expressing his belief that the Plaintiffs' prosecution was improper, that Mr. Skehan acted appropriately in contacting the District Attorney, that Mr. Skehan's allegations were well-founded, and that an independent investigation into the Mamaroneck Police Department was warranted. On March 3, March 22, and April 5, 2004, he was called to testify as a witness for Mr. DiCiccio. During his testimony, he admitted taping conversations with other police officers without their approval, and claimed that these conversations proved that certain officers had perjured themselves during Mr. DiCiccio's disciplinary hearings.

On April 7, 2004, five specifications were preferred against Mr. Micalizzi for recording conversations without approval, and he was suspended without pay. The Board voted to continue this suspension pending a hearing. Mr. Micalizzi filed his Complaint in this Court on April 19, 2004, alleging one claim of First Amendment retaliation, and one claim of selective prosecution in violation of the Fourteenth Amendment. On July 15, 2004, Mr. Micalizzi was reinstated to the Village payroll pending a hearing.

Plaintiffs were found guilty of the charged specifications. All Plaintiffs were terminated as Mamaroneck Police Officers on January 20, 2005.

Fed. R. Civ. P. 56(c) provides that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." In evaluating the record to determine whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

*Preclusive Effect of Justice Cowhey's Factual Findings*

Defendants argue in both motions that this Court is bound by Justice Cowhey's factual findings at the disciplinary hearing. He found that the Plaintiffs had violated certain Mamaroneck Police Department Rules and Regulations, justifying termination. Plaintiffs assert that this Court is not bound by his factual findings. In this they are correct. It might be a different situation if a New York State Supreme Court Justice or a Judicial Hearing Officer of that Court had made factual findings in the course of a state court lawsuit. Justice Cowhey, however, was not acting as a New York State Supreme Court Justice or Judicial Hearing Officer of the Supreme Court. He became hearing officer upon the Board's recusal, which merely conferred upon him whatever authority the Board possessed under New York State law. Because the Board does not sit in a judicial capacity, neither did Justice Cowhey. He sat in a quasi-judicial capacity as an administrative fact-finder. The administrative factual findings at a civil service disciplinary hearing of this sort have no preclusive effect in a subsequent civil rights case in United States District Court. *See Cobb v. Pozzi*, 352 F.3d 79, 101-02 (2nd Cir. 2004).

This Court does not need to address the point raised by Plaintiffs, whether the Board's delegation to Justice Cowhey was lawful, because in any event there is no preclusive effect. In this

case, non-parties to the earlier disciplinary hearing seek to assert defensively the hearing officer's factual findings that various Departmental rules and regulations were violated. These factual findings were based upon "substantial evidence" under New York's Civil Practice Law and Rules ("CPLR") § 7803. Hearsay evidence was admitted to aid the hearing officer in making findings of fact. Substantial evidence is a less stringent burden of proof than a preponderance of the evidence. Substantial evidence is "relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact," and "the kind of evidence on which reasonable persons are accustomed to rely in serious affairs." *See WEOK Broadcasting Corp. v. Planning Bd. of Lloyd,* 79 N.Y.2d 373, 383 (1992). It is a "minimal standard, and requires. . .less than a preponderance of the evidence." *See FMC Corp. v. Unmack,* 92 N.Y.2d 179, 188 (1998). A "preponderance of the evidence" standard requires that inferences drawn from the facts be the only inferences that can be drawn reasonably and fairly. *See Jarrett v. Madifari*, 67 A.D.2d 396, 405 (1st Dep't 1979).

Plaintiffs argue that their Constitutional claims were not before the hearing officer because they executed an "England Reserve" under *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411 (1964). *England* does not apply in this situation, and the Plaintiffs' refusal to raise their Constitutional claims at their hearings does not affect the Court's analysis on this issue, which is based primarily on *Cobb v. Pozzi, supra*.

*Merits of Plaintiffs' Claims*

The Plaintiffs have all brought claims for retaliation under the First Amendment. To prevail on a claim of First Amendment retaliation, the Plaintiff must prove that (1) his speech touched on a matter of public concern, (2) he suffered an adverse employment action and (3) there was a

causal connection between the speech and the adverse employment action, such that the speech was the motivating factor behind the action. *See Cobb v. Pozzi,* 363 F.3d 89, 102 (2nd Cir. 2003). All Plaintiffs were investigated and subjected to discipline, thus presenting sufficient evidence of an "adverse employment action" to survive summary judgment. The issue of causation in this case is fact-intensive and particularly ill-suited for summary judgment. The only remaining issue before the Court on this motion is whether the Plaintiffs engaged in protected speech.

Whether speech addresses a matter of public concern is a question of law for the Court. *See Luck v. Mazzone,* 52 F.3d 475, 476 (2nd Cir. 1995). Speech touches on an issue of public concern if "it relates to any matter of social, political, or other concern to the community." *See Johnson v. Ganim,* 342 F.3d 105, 112 (2nd Cir. 2003). Speech touching on issues of public concern "goes to the essence of self-governance" and is entitled to special protection under the Constitution. *See Connick v. Myers,* 461 U.S. 138, 145 (1983) (citing *Garrison v. Louisiana,* 379 U.S. 64, 74-75 (1964)).

An allegation that the police deliberately arrested a civilian without probable cause, and that the Department engaged in racially-based decision making, is of the highest public concern. The Court concludes accordingly that Mr. Skehan's speech to the District Attorney touched upon an issue of public concern. Mr. Flynn argues that Plaintiffs spoke only as to a purely private dispute within the Police Department. He claims that Mr. Skehan would have been disciplined based solely upon his refusal to report his physician's name, however, he concedes that Mr. Skehan *was punished* for violating the chain of command by reporting police misconduct to the District

Attorney. Mr. Flynn submits that "the complaint made by Jeremy Skehan to the District Attorney's Office was made for a purely personal matter due to the previous problems he had had with the Mamaroneck Police Department." The private motivation or subjective malicious intent, if any, of a whistle-blower who speaks out about police corruption does not detract from his First Amendment protected right so to speak. Defendants' contention on this point is rejected as a matter of law.

Mr. Flynn also asserts that "DiCiccio was speaking upon matters of personal interest and a mere private employment grievance" and states further that a "public employee's comments and criticisms, regarding an internal workplace dispute [does] not constitute a matter of public concern for purposes of a First Amendment claim. . . ." Taking the record as a whole, in light of all of the facts present, the Court concludes that Mr. DiCiccio and Monachelli did not post their memorandum simply to complain about an internal disciplinary matter. Rather, the evidence indicates that these Plaintiffs posted their memorandum in order to speak out on a serious issue of larger public significance; whether the police department was responding adequately to Mr. Skehan's allegations, or whether it was covering up. Issues of public corruption are always of public concern. *See Lewis v. Cohen*, 165 F.3d 154, 163-64 (2nd Cir. 1999). That the Plaintiffs chose a non-public forum (the Police locker room) is not controlling. *See Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983) (the location of speech is not determinative of whether it touches on a matter of public concern) (*citing Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 415-16 (1979)).

Mr. Flynn argues that Mr. Micalizzi was not punished for protected speech (testifying for DiCiccio at the department hearing) but rather because he was tape recording other officers without

-11-

their permission. On February 14, 2004, Mr. Micalizzi had written a letter to the Village Board in which he stated his belief that G.A.'s arrest had been unlawful and that the subsequent disciplinary hearings were improper. Mr. Micalizzi was disciplined shortly after he testified. Mr. Flynn claims that Mr. Micalizzi was disciplined because he admitted tape recording other individuals without their permission. A jury, however, could infer that Mr. Flynn's stated reason for discipline was pretextual, and that Mr. Micalizzi was disciplined because he testified in favor of Mr. DiCiccio, and stated that other individuals in the department had perjured themselves. This presents an issue of fact for the jury. Whether individuals had perjured themselves in the course of a Police disciplinary proceeding presents issues of public concern.

Mr. Flynn argues that this Court is required to conduct a *Pickering* balance test and should conclude that the police department's interest in efficiency and maintaining the public trust outweigh the Plaintiffs' First Amendment interests. *See Pickering v. Board of Education*, 391 U.S. 563 (1968). This argument is a non-starter, and ignores entirely the reality that the Village Police Department possesses no "efficiency" interest that outweighs its obligations to enforce the law fairly and consistently with the Constitution. Plaintiffs' allegations of police corruption attack the very basis for a police force. If public trust has been eroded in the Mamaroneck Police Department based upon Plaintiffs' allegations, the appropriate remedy is not to silence them, but to investigate the truth of the allegations and inform the public of the result. In the words of Justice Brandeis, "Sunlight is the best disinfectant." *See* L. Brandeis, *OTHER PEOPLE'S MONEY* 13 (1913). Accordingly, the Court concludes that genuine issues of fact exist as to Plaintiffs' First Amendment retaliation claims.

Mr. Skehan and Mr. Micalizzi have also brought claims for selective prosecution in violation of the Fourteenth Amendment. Improper motive is a necessary requirement of such a claim. *See Cobb v. Pozzi*, 352 F.3d 79, 99 (2nd Cir. 2004). As in *Cobb*, this is a situation in which the Plaintiffs' selective prosecution and retaliation claims "coalesce" and rely upon similar proof. Mr. Flynn asserts that Mr. Skehan has failed to prove that he was treated differently from other similarly situated officers. Mr. Skehan argues that "all of the other members of the Department who engaged in wrong-doing. . .either were not subjected to any disciplinary action or were afforded informal, command discipline. . .All the other officers who simply engaged in wrong doing, but not constitutionally protected activity, were either permitted to do so with impunity or given minimal command discipline." *See Pls.' Br. at 25-26.*

The record evidence does suggest disparate treatment. Officer S. fired his weapon into the Department's locker room wall and was accused of using office e-mail improperly. He was given five days command discipline, which required the forfeiture of twenty days' pay. He surrendered one day's pay per pay period and did not pay a monetary fine. *See Pls.' Ex. 113 at 15.* Sergeant W. was videotaped sleeping on duty on multiple occasions. He instructed his subordinate officers that sleeping on duty was permissible to avoid an accident caused by fatigue. *See Pls.' Ex. 114 at 32.* He accepted command discipline, forfeited twenty days' pay, and paid a $1,500 fine. Lieutenant P. instructed Police Officer C. to shred a ticket. Mr. P. was given counseling and Mr. C. forfeited twenty days' pay for following orders of a Lieutenant. Officer M admitted threatening a White Plains Police Officer at a hotel in White Plains. *See Pls.'s Ex. 83.* He was not disciplined at all. *See Pls.'s Ex. 96 at 62-64.*

Defendant Flynn offered Mr. Skehan command discipline on one occasion, stemming from Mr. Skehan's alleged insubordination in expressing concern about the Greenland incident, *supra*. Mr. Skehan was not again offered command discipline. Plaintiff has presented sufficient evidence that he was disciplined more harshly than others who violated Department Rules and Regulations, demonstrating disparate treatment.

Mr. Skehan must also demonstrate that this disparity in treatment was caused by an improper motive. Mr. Flynn argues that the Plaintiff is not similarly situated to officers such as Mr. S. This presents a jury issue. Mr. Skehan's conduct, unlike that of the other miscreants, involved some Constitutionally protected activities. A jury weighing motivation could conclude reasonably that the disparity was caused by animus towards Constitutionally protected activity. A genuine issue of fact exists as to whether this disparity in treatment was caused by hostility towards Mr. Skehan or toward his protected First Amendment activities.

Mr. Micalizzi alleges that Officer C. also recorded police officers without their permission, and was not subject to similar suspension or charges. A question of fact exists as to whether Mr. Micalizzi was treated differently because of a legitimate reason, or one that was based upon improper motives.[5]

---

[5]For purposes of this decision, the Court need not now reach the issue of whether the department may lawfully prohibit lawful use of a tape recorder by an officer seeking to establish internal criminality. We note a significant tension is created by a departmental rule which immunizes internal criminals from taping, while their department, like all others, regularly tapes external civilians engaged in crime.

*Qualified Immunity- Mr. Flynn*

Mr. Flynn contends that he is entitled to summary judgment in his favor based on qualified immunity. A public official is entitled to qualified immunity for acts taken in his or her official capacity, unless those acts violated clearly established Constitutional rights of which an objectively reasonable official would have been aware. *See Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211-12 (2nd Cir. 2003). The analysis is three-part. First, the Court must decide whether the plaintiff has alleged a violation of a Constitutional right. Second, the right alleged must have been clearly established at the time of the violation. Finally, the official will receive immunity if his or her actions were objectively reasonable. *See id. at 212.* Accepting plaintiffs' version of the facts as true, if a reasonable official would have believed that he or she was not violating plaintiffs' Constitutional rights, the Court should find qualified immunity. *See Bizzarro v. Miranda et. al.*, 394 F.3d 82, 86 (2nd Cir. 2005). "If plaintiffs' version of the facts reveals that the officials could reasonably have believed they were not violating plaintiffs' constitutional rights, [a] district court should [grant a] motion for summary judgment." *Id.* at 86.

A right is "clearly established" if its contours "are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The unlawfulness of the act must be apparent in light of law existing at the time of the action. *See Huminski v. Corsones*, 386 F.3d 116, 151 (2nd Cir. 2004). Qualified immunity is not determined based upon the knowledge an attorney conducting research would possess, but what a reasonable person should have known. See *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251 (2nd Cir. 2001). It gives "ample room for mistaken judgment" and

protects "all but the plainly incompetent or those who knowingly violate the law." *See Sira v. Morton*, 380 F.3d 57, 81 (2nd Cir. 2004). This "ample room" exists because public officials should not hesitate to act because they fear individual liability for good faith mistakes in judgment. *See Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

Mr. Flynn's argument, framed correctly, is that he lacks any liability to Mr. Skehan because he did not make any decision to suspend or prosecute Mr. Skehan. *See Def.'s Br. at 13* ("There was absolutely no personal involvement of Chief Flynn in the initial action taken against plaintiff Skehan."). It is true that Mr. Skehan was suspended initially by Lt. Ricozzi. However, if Mr. Flynn "approved or authorized" this suspension and recommended to the Board that it be continued, he would be liable. That Lt. Ricozzi suspended Mr. Skehan initially is not dispositive. A question of fact exists as to whether Mr. Flynn was involved at any point in the decision making process. Evidence is presented that he encouraged Lt. Ricozzi and the Board to act, which would be a basis for personal liability under 42 U.S.C. § 1983. A suggestion that the Chief was no more than an innocent and unconcerned bystander invites judicial skepticism and presents, in any event, a jury question.

Mr. Flynn contends further that "a reasonable officer in Chief Flynn's position could have believed that Plaintiff DiCiccio violated his duty to follow a lawful order when he refused to answer questions and provide documents pertaining to the May 30, 2003 memorandum." He asserts further that a reasonable officer could have believed that dropping a weapon purposefully to the ground in the presence of a superior officer would constitute disobedience. Indeed, DiCiccio admits that he dropped his gun at Sergeant Holland's feet "as a sign of disrespect." *See Def.'s Ex. G at 252.* Also,

Defendant Flynn states that a reasonable officer could have believed that discussing an ongoing

disciplinary matter, accusing a fellow officer of wrongdoing and taping conversations with other

police officers without their permission would justify discipline.

Although the Plaintiffs filed three separate Complaints, they are united in interest, and their

claims arise out of a common chain of events. Plaintiffs engaged in some relatively minor

unprotected misconduct which would justify discipline. Intermingled with this unprotected conduct

is significant conduct that is protected by the First Amendment. The Plaintiffs have produced

evidence of Mr. Flynn's hostility towards their First Amendment protected conduct and speech.

Under all the circumstances of this case, genuine issues of fact exist as to why the Plaintiffs were

disciplined to the extent they were, and what Mr. Flynn's motives were in doing so. Because of the

numerous disputed facts that exist as to why Mr. Flynn took the actions which he did, the Court is

unable to conclude that his actions were objectively reasonable, or that a reasonable official would

not have known that these actions violated clearly established Constitutional rights. *See Johnson v.*

*Ganim et al.*, 342 F.3d 105, 117 (2d Cir. 2003) (The Defendant's intent is relevant in a motive-

based Constitutional tort. When "factual issues exist on the issue of motive or intent, a Defendant's

motion for summary judgment on the basis of qualified immunity must fail.")

We are well past the time when public officials could claim that their subordinates

abandoned all First Amendment protections upon entering the workplace. *See Pickering, 391 U.S.*

*at 568* (stating that the notion that public employees may "constitutionally be compelled to

relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on

matters of public interest. . .has been unequivocally rejected in prior decisions of this Court.");

*Connick, 461 U.S. at 142* ("For at least 15 years, it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."). Reporting a good faith belief that criminal activity has occurred is clearly privileged under New York State and Federal Law. No reasonable official could claim ignorance of this right. *See Toker v. Pollak*, 44 N.Y.2d 211, 219-20 (1978):

> A communication is said to be qualifiedly privileged where it is fairly made by a person in the discharge of some public or private duty, legal or moral. . .A qualified privilege is sufficient to foster the public purpose of encouraging citizens to come forth with information concerning criminal activity. . .a qualified privilege does provide an atmosphere in which a civic-minded citizen may, without fear, convey information which he believes the disclosure of which will redound to the benefit of the public. Only those who act out of malice, rather than the public interest, need hesitate before speaking.

It is alleged in this case that Mr. Skehan made his allegations out of malice, which would deprive him of his privilege. The issue of malice is also fact-intensive, and accepting the Plaintiffs' version of the facts as true, as we must for purposes of the motion, the Court concludes that Mr. Skehan's communication are privileged unless malice is proved, and Mr. Flynn's entitlement to qualified immunity present a fact intensive issue in the context of this case.

A public servant has a clearly established right to speak out on issues of public concern. In this case, Mr. DiCiccio and Monachelli wrote a memorandum expressing their belief that Mr. Skehan was being disciplined unlawfully for exercising a Constitutionally protected right. This memorandum was also protected speech under the First Amendment. A reasonable official would understand that a PBA President and Vice-President are especially permitted to speak out on issues of public concern affecting the PBA membership.

Although the process which is due is flexible and depends upon the facts of the case, the

-18-

retention of public employment is a property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). Indeed, New York courts have required that an individual whose public employment is at stake be given similar due process rights as a criminal defendant. *See Avery v. Rechter*, 71 A.D.2d 500, 503 (3d Dep't 1979). It would be improper, therefore, to penalize a public employee for invoking a privilege such as the attorney-client privilege. Finally, a reasonable official would understand that an individual, such as Mr. Micalizzi, has a clearly established right to testify at a quasi-judicial disciplinary hearing without suffering retaliation. Objective reasonableness is a fact-intensive inquiry, which focuses on Mr. Flynn's motives. The Plaintiffs are required to produce some evidence of improper motive to survive summary judgment. *See Blue v. Koren*, 73 F.3d 1075, 1084 (2nd Cir. 1995). As noted earlier, while Mr. Flynn's motives and reasons for taking his actions are unclear upon this record, Plaintiffs have presented sufficient evidence of hostility towards Plaintiffs' exercise of their Constitutional rights to raise a genuine issue of fact for the jury. Accepting the non-moving parties' version of the facts as true, Mr. Flynn is not entitled to qualified immunity, and his actions are not shown to be objectively reasonable

*Municipal Liability*

The Village and the members of its Board of Trustees argue that Plaintiffs have not shown that their injuries were caused by a municipal plan or policy and therefore, as a matter of law, municipal liability cannot be shown. While a municipality cannot be held liable under a general theory of *respondeat superior,* it can be held vicariously liable for the action of its agents and officials where the action violates Constitutional rights and implements or executes official policy as adopted and promulgated by that body's officers. *See Monell v. Dep't of Soc. Serv.*, 436

U.S. 658, 690 (1978). Municipal liability exists under three scenarios: (1) an official or

employee acts under an expressly adopted official municipal policy; (2) an official or employee

acts under a longstanding unwritten municipal policy or custom that carries the force and effect

of an official policy; or (3) the official or employee is acting as a "final policymaker." *See St.

Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). Whether a public official has authority to act as a

"final policymaker" is determined by the authority granted that individual under state law. *See

id. at 124.* The authority to make municipal policy implies necessarily that the actor is a final

policymaker. Mere discretionary authority does not establish municipal policy, however, a

subordinate employee's decisions may become municipal policy if they are reviewed and adopted

by a supervising authority who is a final policymaker. Once adopted and ratified, such decisions

carry the force, and potential liability, of official municipal policy under § 1983. *See Pembaur v.

City of Cincinnati*, 475 U.S. 469, 481-84 (1986). The issue is not whether an official is a final

policymaker in a grand categorical sense. Plaintiffs need only demonstrate that an official or

employee is a final policymaker on the particular issue before the Court. *See McMillan v.

Monroe County*, 520 U.S. 781, 785 (1997).


Plaintiffs allege, and this Court agrees, that the Village Board of Trustees is the final

policymaker on the issue of police officer discipline. Evidence submitted on the motion suggests

that the Board knowingly ratified the actions of Defendant Flynn and by doing so established

municipal policy. Plaintiffs claim, and this Court agrees, that a "clear statutory backdrop [vests]

in the Board absolute final decision making authority with respect to every aspect of police

personnel related matters. . . ." The Board and its members function as police commissioner

under New York law, in the absence of a local law to the contrary. *See* N.Y. Unconsolidated Law

§ 5711-q(4). The Board may establish a police department, appoint a chief of police, as well as

lieutenants, sergeants and patrolmen. It is responsible for fixing compensation. It may abolish a

police department. N.Y. Unconsolidated Law § 5711-q(8) provides that "The Board of Trustees

or municipal board. . .may make, adopt and enforce rules, orders and regulations for the

government, discipline, administration and disposition of the police department of such village,

and the members thereof." Section 5711-q(9) provides further that:

> The board of trustees or municipal board shall have power and is authorized to adopt and
> make rules and regulations for the examination, hearing, investigation and determination
> of charges. . .but member or members of such police force shall not be fined,
> reprimanded, removed or dismissed until charges. . .[are] determined by such board of
> trustees or full municipal board. . .and the affirmative vote of a majority of such members
> shall be necessary to a conviction on any such charges. . .Such board of trustees or
> municipal board shall have the power to suspend without pay, pending the trial of
> charges, any member of such police force.

The Board has the statutory power to reinstate an officer who resigns. While the Police

Chief has limited authority over personnel, *see § 5711-q(21)*, his ability to discipline or relieve an

active police officer is contingent upon the consent of the Board. The Police Chief has the power

to suspend an officer without pay pending a disciplinary hearing, but he does not have the power

to determine guilt or punish an officer for the charged offenses. That power belongs solely to the

Board. New York law vests clear authority with the Board over the issue of police disciplinary

matters. Accordingly, the Court concludes that the Board is the final policymaker within the

meaning of *Monell* and *St. Louis*.

Plaintiffs, to defeat summary judgment, do not need to demonstrate the existence of a

"grand conspiracy" between Defendant Flynn and the Board. The Board's ratification of Constitutional violations standing alone would be sufficient to subject the Village to liability. *See Pembaur, 475 U.S. at 483* ("Municipal liability under § 1983 attaches where - - and only where - - a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."). Defendant Flynn does not have a right to refer charges against the Plaintiffs in retaliation for Constitutionally protected speech, nor can the Plaintiffs be terminated because of this conduct.

Plaintiff's Skehan and DiCioccio have presented clear evidence that the Board acquiesced in Defendant Flynn's actions. Plaintiff Monachelli was never suspended by Defendant Flynn, he was placed on desk duty. The Board never voted to continue a suspension. Nonetheless, sufficient evidence does exist to prove that the Board consented in his disciplinary charges and subsequent termination. As final policymaker, a disciplinary proceeding requires the Board's approval. This constitutes Board action as a policy maker and serves as the basis for municipal liability. Summary Judgment based on an absence of municipal liability is denied.

*Qualified Immunity-The Village and Trustees*

The Village Trustee defendants, sued individually, argue that a clearly established Constitutional right is not at issue, and that Mr. Skehan's speech was not protected when he went to the District Attorney because he was not really trying to bring public concerns to light, but rather was trying to "achieve a personal, employment-related objective of maligning the

-22-

Department and disparaging the reputation of his superiors" by making "knowingly false

representation[s]" to the DA's office. *Def. Memo at 42.* They argue that they acted upon the

disciplinary charges before them, which alleged that Mr. Skehan's "motivation to report claimed

misconduct was based on malice and information that was knowingly false" and state that

"Skehan's intentional reporting of false information to the District Attorney, *if proven,* would rise

to the level of slander, which would be specifically precluded from Constitutional protection

under the First Amendment." *Memo at 24* (emphasis added).


First Amendment protected speech on a matter of public concern is not determined by the

motive of the speaker. *See Johnson,* 342 F.3d at 114 ("[t]he mere fact that [Plaintiff] took a

personal interest in the subject matter. . .does not remove [the speech] from the protection of the

First Amendment.") Most whistleblowers have an axe to grind. Nor is such Constitutional

protection determined by the perceived truth of the speech. A speaker is not required to prove

the truth of an allegation for it to constitute a matter of public concern. *See Farhat v. Jopke,* 370

F.3d 580, 591 n.8 (6th Cir. 2004) (a public employee who "engage[s] in speech alleging public

corruption [does not] have to prove the truthfulness *of that speech* in order to show it touches

upon a public concern.") (emphasis in original); *Gazarkiewicz v. Town of Kingsford Heights,* 359

F.3d 933, 942 (7th Cir. 2004); *Buschi v. Kirven,* 775 F.2d 1240, 1248 (4th Cir. 1985) (relevant

question is whether a comment, irrespective of its truth or falsity, touches on a matter of public

concern); *Munafo v. Metro. Trans. Auth.,* 2003 U.S. Dist. LEXIS 13495, *36 (E.D.N.Y. 2003)

(Korman, C.J.) ("[plaintiff] does not need to prove that his complaints were accurate in order to

sustain his claim for wrongful termination; retaliation in response to his speech is prohibited by

the First Amendment regardless of its truth.").

The Court has concluded earlier in this decision that the Plaintiffs' speech was protected. The Court need only address whether the Board members' actions were objectively reasonable. The Court concludes that their actions in adopting, and perhaps rubber-stamping Chief Flynn's recommendations and approving the subsequent recommended disciplinary action without exerting any apparent due diligence to evaluate the situation, may be found by the trial jury to be not objectively reasonable in light of the circumstances of this case. Furthermore, even if their actions *were* objectively reasonable, Plaintiffs have made particularized proffers of evidence of unconstitutional motives, which are sufficient to negate any claim of reasonable objectiveness for purposes of summary judgment based on qualified immunity. *See Blue v. Koren, 72 F.3d at 1084* ("The reasonableness of the conduct ... requires in response a particularized proffer of evidence of unconstitutional motive."). When the Board voted on June 10, 2003 to continue Mr. Skehan's suspension without pay, the board members had before them the charges preferred by the Police Department, which consisted of forty seven separate specifications. The charges alleged essentially that Mr. Skehan violated Department policy by going to the District Attorney instead of through the Department's chain of command, and by lying about the actions of a superior officer. Defendants assert:

> "[w]hen examining the facts, known to the Board, at the time they voted to continue the suspension, the record demonstrates that they knew no more than what was contained in the four corners of the charge and Chief FLYNN's written recommendation of June 9, 2003...the five hearing officers had no reason to believe that there was a violation of a constitutional right contained within the charges."

-24-

*Def's Memo* at 24-5. This Court disagrees, and finds it virtually impossible to believe that the Trustees lacked knowledge that Constitutional rights were at issue in this case. In addition to the obviously public nature of the disputes in this case and the highly unlikely possibility that the board members were unaware of the nature of these conflicts, the record evidence also indicates that the Board had been sent copies of the May 30, 2003 memorandum posted by DiCioccio and Monachelli on the PBA Bulletin Board. Indeed, Chief Flynn's own memorandum to members of the Department dated June 4, 2002, [sic] specifically notes that his memorandum was being provided to the Board members (in their capacity as Police Commissioners) because the Skehan and DiCioccio memos had been forwarded to the Board. *See Defs.' Ex. TT*. The DiCioccio memorandum specifically sets forth that Mr. Skehan reported allegedly race-based decision-making within the police department to ADA Chartier and it also specifically referenced his "constitutionally protected right to report" what he believed was wrongdoing. *See Ex. SS*. The caption of the memorandum includes "Violation of Members Civil Rights" as the subject of the memorandum. The argument of the Trustee defendants that they did not know is absurd in light of the written submissions they possessed when they acted.

Defendants also raise the argument that no liability attaches to their actions, if the same actions would have been taken in the absence of any protected speech. This clearly presents a jury question which cannot be resolved by motion. They argue that they are not liable because Chief Flynn's June 9, 2003 memorandum to the Board requested that the Board exercise its authority to continue Officer Skehan's suspension without pay pending the trial of the charges because his "continued presence in the Police Department during the trial of this matter would be

highly disruptive and substantially impede operational efficiency." *See Defs.' Ex. JJJ.* The Chief

also undertook to advise the Trustees that he believed firmly that "in allowing for the suspension

without pay during the trial of disciplinary charges, the law has in mind the type of situation

facing the Mamaroneck Police Department with respect to Officer Skehan." *Id.* Suspension

indefinitely without pay is in itself highly punitive, as any person with common sense would

know.

The record before the Court presents a genuine issue of fact as to whether the Plaintiffs

were targeted unlawfully for being outspoken about their concerns of corruption and

discrimination within the Department. *See Melzer v. Bd. of Educ.*, 336 F.3d 185, 193 (2d Cir.

2003)(citations omitted):

> [W]hen the government prevails in the balancing test, the employee may still carry the day
> if he can show that the employer's motivation for the discipline was retaliation for the
> speech itself, rather than for any resulting disruption.

Factual issues going to the motivation of the Village board members do exist, and

resolution of these issues are essential to a determination of whether qualified immunity protects

the individual board members from liability for their punishment and ultimate termination of

Plaintiffs. In this day and age it is very unlikely that board members responsible for the oversight

and administration of police department policies and operations would, as is claimed here,

reasonably rely solely on a recommendation to suspend, continue a suspension or terminate an

employee without exercising due diligence of their own to determine whether sound reason

existed for these recommendations. Little to no evidence has been proffered by the Board

members that they exercised the due diligence required to determine the justification or bases for

-26-

Mr. Flynn's recommendations. The New York state statute requiring that any such recommendation be decided by the Board exists precisely so that another more neutral and detached authority might ensure the appropriateness of any disciplinary recommendations by the Chief. A trial jury may find the Trustees' conduct was tantamount to delegating their duties as police commissioners responsible for disciplinary matters to the Chief. This was not objectively reasonable. Accordingly, the intentions of the Trustees present a fact intensive issue which must be determined by the trial jury.

In this case when "drawing all inferences and resolving all disputes in favor of plaintiffs where reasonable," *Bizzarro, 394 F.3d at 87*, the Court concludes that there are numerous disputed factual issues that preclude the granting of summary judgment based on qualified immunity or any other legal theory. See also, *Johnson, supra*.

### Conclusion

Defendants' motions for summary judgment are denied. A final pre-trial conference of counsel with the Court will be held on April 29, 2005 to set a trial date.

SO ORDERED.

Dated: White Plains, New York
April 15, 2005

*Charles L. Brieant*

Charles L. Brieant, U.S.D.J.